UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 22-cv-21201-KING/DAMIAN

CAREN JOY MCDANIEL,

      Plaintiff,

v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

      Defendant.

_____/

**REPORT AND RECOMMENDATION ON**
**CROSS MOTIONS FOR SUMMARY JUDGMENT [ECF NOS. 17 & 20]**

THIS CAUSE is before the Court on the parties' Cross Motions for Summary Judgment, filed October 31, 2022 and January 17, 2023. [ECF Nos. 17 and 20]. Plaintiff, Caren Joy McDaniel ("Plaintiff" or "Ms. McDaniel"), seeks reversal and remand of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for a period of disability and disability insurance benefits.[1]

The undersigned has reviewed the parties' memoranda [ECF Nos. 17, 20, and 23], the administrative record [ECF No. 14], the pertinent portions of this Court's record, and all relevant authorities and is otherwise fully advised in the premises. For the reasons set forth below, the undersigned finds that the ALJ failed to properly analyze Ms. McDaniel's ability to perform her past relevant work, that his finding as to Ms. McDaniel's residual functional capacity is not supported by substantial evidence, and that he failed to consider material evidence in reaching his conclusions, and therefore, the undersigned recommends the Court grant Plaintiff's Motion for Summary Judgment [ECF No. 17], deny Defendant's Motion for

---

[1] This matter was referred to the undersigned for a ruling on all pre-trial, non-dispositive matters and for a Report and Recommendation on any dispositive matters. [ECF No. 2]. *See* 28 U.S.C. § 636(b)(1)(B).

Summary Judgment [ECF No. 20], and reverse the decision of the Commissioner and remand for further proceedings.

## I.   BACKGROUND

### A.   *Ms. McDaniel's Claim For Benefits*

Ms. McDaniel initially alleged disability beginning on January 31, 2018 because of depression. (R. 142–43).[2] In subsequent disability reports, Ms. McDaniel alleged that her medical condition had worsened and that she had new conditions, including other mental and physical impairments. (R. 488, 503). She was fifty-eight (58) years old on her alleged onset date and sixty (60) years at the time of the administrative hearing, making her a "person of advanced age" (age 55 or older) under Social Security regulations. *Id.*; *see* 20 C.F.R. § 404.1563(e).

Ms. McDaniel completed college and obtained a bachelor's degree. (R. 112, 461). She has past relevant work experience as a supervisor/administrator at a domestic violence shelter where she worked from 1980 through her retirement in April 2016. (R. 460–61, 108).

### B.   *Ms. McDaniel's Hearings Before The ALJ*

Ms. McDaniel appeared, represented by counsel, and testified at three hearings before Administrative Law Judge Gracian Celaya ("ALJ") on November 22, 2019, June 2, 2021, and August 13, 2021. (R. 35–140).

#### 1.   The First Hearing Before The ALJ

At the first hearing, Ms. McDaniel appeared, represented by counsel, and testified that she lives by herself in an apartment that she rents. (R. 111–12). She receives a pension check,

---

[2] All references to "R." refer to the transcript of the Social Security Administration filed on August 29, 2022. [ECF No. 14]. The page numbers listed in this document refer to the bold numbers found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the Court's electronic docketing system or any other page numbers.

and her fiancé gives her money occasionally. *Id.* Ms. McDaniel worked for over thirty-five years as a supervisor at a domestic violence shelter. (R. 113). In that position, she hired and supervised clerical staff and maintenance employees, handled administrative tasks, such as managing payroll and procurement of supplies, and oversaw the cleaning/maintenance of a three-story building. *Id.*

According to Ms. McDaniel's testimony at the first hearing, she is unable to work due to numbness in her hands, legs, and feet, as well as neck problems and other physical ailments, including dizziness and headaches. (R. 113–14). She takes medications for high blood pressure, cholesterol, insomnia, and anxiety. (R. 115). Ms. McDaniel testified that on a good day she can walk for about fifteen minutes before resting, and if she walks more than fifteen minutes, her feet start to burn. (R. 116–17). She can lift less than ten pounds, and she would not want to lift more than a gallon of milk. (R. 117). Ms. McDaniel also has limitations in sitting, and she testified that she can sit for one hour straight. *Id.*

As for her activities of daily living ("ADL"), Ms. McDaniel testified that on a good day she typically wakes up at about 7:30 a.m. and, if she does not have anything planned, she prepares breakfast, cleans things up, makes her bed, and watches television throughout the day. (R. 117–18). When she has other things to do, like go to appointments or take her mother to the doctor, Ms. McDaniel testified that she gets up at the same time and gets dressed. *Id.* She does grocery shopping with the help of her fiancé, attends church on Sunday, and occasionally watches her grandsons and takes them to the park or to the beach. (R. 118, 123). On a bad day, which happens at least three days a week, Ms. McDaniel does not want to get out of bed or watch television because she feels depressed from the memory of her husband's death. (R. 124–25).

Ms. McDaniel testified that she experiences side effects from her medications, including drowsiness, nervousness, trembling, insomnia, upset stomach, dizziness, and headaches. (R. 119). She cannot sleep without getting up a couple of times during the night to use the bathroom. (R. 120). When she wakes up the following day, Ms. McDaniel feels drowsy for at least three hours in the morning but at about 10:00 she starts feeling more awake and alert. *Id.*

Regarding her impairments, Ms. McDaniel testified that most times her fiancée helps her with getting dressed, like buttoning a shirt, and opening containers because of problems with her hands. (R. 120–21). She also described problems with reaching because her hand will "cramp up or freeze up." *Id.* Ms. McDaniel avoids walking or standing as much as she can because of pain in her feet. (R. 121). She explained that her doctor gave her medication and an injection on the foot for the pain but neither worked. (R. 122). And, although her doctor also recommended surgery that "may or may not work," Ms. McDaniel refused the surgery because she is afraid her condition may worsen. (R. 123). As for her ability to concentrate and maintain focus, Ms. McDaniel testified that it is becoming "more difficult" for her to concentrate, but she described her memory as "pretty good." *Id.*

Ms. McDaniel's fiancé, Sherwood DuBose, briefly testified at the hearing before the ALJ about Ms. McDaniel's impairments. (R. 126–29). Mr. DuBose testified that he has known Ms. McDaniel for about twenty-five years, and he has noticed that her condition with her arms and feet has "gotten progressively worse over the years." (R. 127). Mr. DuBose also testified that Ms. McDaniel has experienced stress, anxiety, and depression during the last two years and that she "constantly" complains about her hands and feet, and needs help with doing chores, lifting things, or cooking. (R. 128–29).

## 2.     The Second Hearing Before The ALJ

After the first hearing, the ALJ issued a decision denying Ms. McDaniel's claims on grounds she was not disabled. (R. 168–78). The Appeals Council granted Ms. McDaniel's request for review of the ALJ's first decision, vacated the decision, and remanded the claims to the ALJ for further consideration. (R. 184–87). The ALJ then held a telephonic hearing on June 2, 2021. (R. 52–103).

At the second hearing, Ms. McDaniel appeared, represented by counsel, and provided new testimony and new medical evidence. (R. 57). Ms. McDaniel testified that she takes medication on a regular basis for her depression, anxiety, stress, post-traumatic stress disorder ("PTSD"), high blood pressure, and high cholesterol. (R. 63).

Regarding her past work, Ms. McDaniel explained that she retired from her administrative position at the domestic violence shelter in 2016 to take advantage of retirement benefits that were set to change. *Id.* In 2019, Ms. McDaniel worked part-time as a volunteer with the intention of obtaining full-time employment at a transitional housing facility for domestic violence victims, but she was terminated from that volunteer position because of her ongoing health issues and absences. (R. 64–66, 78–79, 532–33).

According to Ms. McDaniel, she is currently unable to work due to her PTSD. (R. 70). She explained that after she stopped working, her body "went into shock," whereas before, when she was working, she "kept busy." *Id.* As a result, her anxiety kicked in due to a traumatic experience years ago when she witnessed her husband's death during a violent shootout involving law enforcement and others who were also shot and killed. *Id.* Ms. McDaniel testified that her depression and anxiety also keep her from being able to work. (R. 71). She testified that she no longer watches her grandsons or takes them to the park or to the beach like she had testified at the first hearing. (R. 74). She stated she has a hard time staying

5

focused because of her "intrusive thoughts" relating to the traumatic event involving her husband's death, and she gets easily startled by things like fireworks or when her neighbors open their front door and the wind slams it shut. (R. 76).

### 3.    The Third Hearing Before The ALJ

On August 13, 2021, the ALJ held a supplemental hearing to obtain new testimony from a vocational expert regarding Ms. McDaniel's past work. (R. 35–51). Ms. McDaniel appeared, represented by counsel, and presented new testimony regarding her past work at the domestic violence shelter. She described her position as an "administrative officer" with tasks such as supervising the clerical and maintenance staff, ordering supplies and food, acting as the human resources personnel, and training staff. (R. 40). Ms. McDaniel also testified about the three-story building she oversaw and explained that she would take the stairs and go to each floor, every one or two hours, to check that all bathrooms, residences, and kitchens were cleaned. (R. 42).

### C.    *Relevant Medical Evidence And Treating Physicians' Opinions*

The record contains extensive treatment notes and evaluations from doctors and other professionals regarding Ms. McDaniel's physical and mental conditions. Below is a non-exhaustive summary of the relevant medical evidence and expert opinions regarding Ms. McDaniel's alleged impairments, as well as the opinions of the impartial vocational experts who testified regarding Ms. McDaniel's past relevant work.

### 1.    Opinions And Evaluations Of Primary Care Physician Pamela Stearns

Ms. McDaniel was seen and treated by her primary care physician, Pamela Stearns, M.D. Dr. Stearns's treatment records indicate that Ms. McDaniel has a past medical history of hypertension, hyperlipidemia, and migraines. (R. 674). In October 2016, prior to the alleged onset date, Dr. Stearns diagnosed Ms. McDaniel with essential hypertension and

6

prescribed a medication regime after which her hypertension remained under control. (R. 676, 658). In May 2017, Dr. Stearns found a right lobe thyroid nodule but no palpable adenopathy or axillae. (R. 665).

Dr. Stearns diagnosed Ms. McDaniel with mild depression in July 2018. (R. 653). The treatment note indicates that Ms. McDaniel reported feeling down, depressed, or hopeless and having trouble concentrating on things. (R. 652). Dr. Stearns observed that Ms. McDaniel appeared well nourished, alert, oriented, that her cognitive function was intact, and judgment and insight were good. (R. 653). Ms. McDaniel told Dr. Stearns that she was seeing a psychologist, and she reported "doing well" and indicated she would continue with counseling. *Id.*

Dr. Stearns's notes indicate that in November 2018, Ms. McDaniel first reported experiencing numbness in her extremities, lightheadedness, and dizziness for several months, in addition to insomnia. (R. 647–48, 827–31). The examination notes indicate that Ms. McDaniel showed a normal range of motion of the joints, a normal gait, and a strength of "5/5" for her upper and lower extremities. *Id.* Dr. Stearns diagnosed Ms. McDaniel with distal paresthesia, cerebellar dysfunction, and PTSD, referred her for a brain MRI, and prescribed Citalopram Hydrobromide for the PTSD. (R. 648). Ten days later, Ms. McDaniel returned for a follow-up on her brain MRI results, which indicated mild bilateral mastoiditis. (R. 824–26, 650). Dr. Stearns prescribed antibiotics to treat the mastoiditis and referred Ms. McDaniel to a neurologist for further evaluation. (R. 825).

In January 2019, Ms. McDaniel returned to see Dr. Stearns to have medical disability forms filled out and for medication refills. (R. 819). Dr. Stearns noted that Ms. McDaniel reported she was seeing a podiatrist for her plantar fasciitis and that she had an injection on her left foot, but it did not relieve the pain. (R. 821). Dr. Stearns also noted that Ms. McDaniel

denied symptoms of insomnia, loss of appetite, shortness of breath, dizziness, and headaches. (R. 820).

In October 2019, Ms. McDaniel returned to see Dr. Stearns complaining of bilateral upper arm weakness and some shortness of breath. (R. 812). Dr. Stearns referred Ms. McDaniel to a neurologist for the upper extremities' weakness and prescribed medication for the shortness of breath. (R. 813). At an appointment the following month, Ms. McDaniel denied experiencing shortness of breath or feeling depressed. (R. 870–72). At two later appointments with Dr. Stearns in June and November 2020, Ms. McDaniel denied having foot pain, headaches, dizziness, anxiety, or depression. (R. 860–69).

### 2. Opinions And Evaluations Of Licensed Social Worker Carter Wiggins

Ms. McDaniel attended therapy sessions with Carter Wiggins, a licensed clinical social worker, from January to August 2018. An initial bio-psychosocial evaluation prepared by Mr. Wiggins on January 26, 2018 indicates that Ms. McDaniel's chief complaint was a depressive mood with extreme highs and lows and that she suffered from PTSD due to witnessing her husband's death. (R. 594). Mr. Wiggins observed that Ms. McDaniel appeared sad and expressionless, and her mood was depressed and anxious; that she reported poor appetite, low energy, sleep disturbance, and a sense of worthlessness; that her attitude and behavior were suspicious, irritable, apathetic, impulsive, and fearful; and that she had poor concentration and recent memory, and her insight and judgment were moderate. (R. 596).

Mr. Wiggins noted that during follow-up therapy sessions in February and March 2018, Ms. McDaniel presented as anxious with a suspicious and guarded mood. (R. 597–98). Mr. Wiggins also noted that Ms. McDaniel reported taking medication for hypertension and high cholesterol, and she appeared alert, coherent, and oriented to time, place, and person. *Id.* Mr. Wiggins diagnosed Ms. McDaniel with major depressive affective disorder and

8

anxiety disorder. *Id.* Ms. McDaniel refused to start taking medication at that time, and the progress note indicates that her goals were to become more open and receptive to medication and to decrease her anxiety. (R. 599). At a therapy session in April 2018, Ms. McDaniel reported to Mr. Wiggins that she had impaired sleep, poor appetite, concentration, and focus, and low self-efficiency. (R. 600). A progress note indicates that Ms. McDaniel's treatment plan was progressing, and Mr. Wiggins suggested that she consult with a psychiatrist and continue individual therapy. (R. 601).

The following month, in May 2018, Mr. Wiggins found that Ms. McDaniel was significantly impaired based on results from a "Burns Depression Checklist," in which she reported having "a lot" of feelings of guilt, poor self-image, and concerns about her health and "moderately" experiencing sadness, low self-esteem, irritability, loss of motivation, and sleep changes in the past several days. (R. 602–05). At therapy sessions in July and August 2018, Mr. Wiggins noted that Ms. McDaniel appeared anxious, overwhelmed, and excessively worried. (R. 608, 610, 612). The progress notes indicate that Ms. McDaniel's mood was depressed, she appeared intermittently interactive, and her functional status was impaired. *Id.* She reported having negative thoughts, impaired sleep and appetite, and low self-efficiency. *Id.* The records indicate that Ms. McDaniel returned to see Mr. Wiggins approximately six months later, in March 2019, and that she continued to excessively worry and presented with a diminished mood and affect. (R. 781). Mr. Wiggins observed Ms. McDaniel's mood as depressed, anxious, and angry. *Id.*

In April 2019, Mr. Wiggins completed a Psychiatric Evaluation and Medical Assessment regarding Ms. McDaniel's ability to do work-related activities. (R. 688–94, 792–96). In the Evaluation, Mr. Wiggins diagnosed Ms. McDaniel with major depression, PTSD, hypertension, and severe stressors, and noted she experienced headaches and fatigue as side

effects from medications. (R. 792). According to Mr. Wiggins, Ms. McDaniel's psychiatric impairments are expected to last for a continuous period of at least twelve months, and she is likely to call in sick and unable to work due to her impairments more than four times a month. *Id.* Mr. Wiggins opined that Ms. McDaniel is likely to be off task more than 15% during an 8-hour workday, and she would not be able to work at a regular, full-time job, or even a simple routine job, on a sustained basis. (R. 793). In the Medical Assessment, Mr. Wiggins opined that Ms. McDaniel had poor or no ability in understanding, remembering, and carrying out complex instructions, interacting with others, maintaining attention/concentration, and functioning independently. (R. 794–95). He concluded that Ms. McDaniel had "impaired social/occupational skills" due to years of trauma concealment and that she was isolated, withdrawn, fearful, and aloof. *Id.*

### 3.   Opinions And Evaluations Of Psychiatrist Joseph Poitier

Ms. McDaniel was treated by psychiatrist Joseph Poitier, M.D. During her initial evaluation with Dr. Poitier on March 31, 2018, Ms. McDaniel reported she "can't sleep" and that when she falls asleep, she cannot get up. (R. 639, 646). Following the initial evaluation, Dr. Poitier found no depression, mood elevation, or apparent serious mental status abnormalities. *Id.* Dr. Poitier's progress note from a follow-up session four months later, in July 2018, indicates that Ms. McDaniel presented as friendly, cooperative, and attentive but her demeanor was flat, sad, and downcast; her thought associations were intact, thinking was logical, and thought content appeared appropriate; and she reported feeling paranoid due to the recurring memories of her husband's death. (R. 640). Dr. Poitier noted signs of anxiety but found no signs of hyperactive or attentional difficulties, and he diagnosed Ms. McDaniel with major depressive disorder and prescribed Celexa and Restoril. *Id.*

Two months later, in September 2018, Ms. McDaniel reported to Dr. Poitier feeling anxious, but Dr. Poitier found no signs of anxiety during the session and described Ms. McDaniel's mood as "euthymic with no signs of depression or manic process." (R. 641). Dr. Poitier continued to prescribe Celexa and Restoril. *Id.* The following month, in October 2018, Ms. McDaniel denied any psychiatric problems or symptoms, and she specifically denied psychotic, depressive, or anxiety symptoms. (R. 643, 800). Dr. Poitier again observed that Ms. McDaniel's mood was euthymic with no signs of depression or mood elevation, and her orientation, memory, and cognitive abilities were normal and intact. *Id.*

In January 2019, Ms. McDaniel returned to see Dr. Poitier and reported that she "has a lot of triggers that bring back memories of the shooting" of her husband. (R. 802–03). Dr. Poitier found no signs of anxiety, depression, or mood elevation, and he observed Ms. McDaniel's attention span was normal with no signs of hyperactivity, and her insight and judgment were intact. *Id.* Dr. Poitier diagnosed Ms. McDaniel with PTSD and continued to prescribe Celexa and Restoril. *Id.*

At a follow-up session in March 2019, Ms. McDaniel again reported having memories of her "husband's murder." (R. 804). Dr. Poitier observed Ms. McDaniel presented as friendly, but she appeared flat, glum, doleful, wary, and unhappy. *Id.* He noted that Ms. McDaniel's slowness of physical movement, speech, and thinking, reveal a depressed mood. *Id.* During that March 2019 session, Dr. Poitier completed a Psychiatric Evaluation and Medical Assessment. (R. 708–17, 782–91). In the Evaluation, Dr. Poitier diagnosed Ms. McDaniel with PTSD due to the traumatic experience of witnessing her husband's death. (R. 708). Dr. Poitier listed drowsiness as a side effect of Ms. McDaniel's medications, and, like Mr. Wiggins's assessment, Dr. Poitier concluded that Ms. McDaniel's psychiatric impairments are expected to last for a continuous period of twelve months, and she is likely

11

to call in sick and unable to work due to her impairments more than four times a month. *Id.*
Dr. Poitier also opined that Ms. McDaniel is likely to be off task more than 15% during an 8-hour workday, and she would not be able to work at a regular, full-time job, or even a simple routine job, on a sustained basis. (R. 709).

In his Medical Assessment following the March 2019 visit, Dr. Poitier opined that Ms. McDaniel had poor or no ability in understanding, remembering, and carrying out complex instructions, interacting with others, maintaining attention/concentration, and functioning independently. (R. 710–11). Dr. Poitier found that Ms. McDaniel's impairments meet the criteria for Listing 12.04, for depressive disorder, based on medical documentation showing a depressed mood, diminished interest in almost all activities, sleep disturbance, observable psychomotor agitation or retardation, decreased energy, and feelings of guilt or worthlessness, and marked limitations in two areas of mental functioning, or paragraph B criteria, including the ability to interact with others and the ability to concentrate, persist, or maintain pace. (R. 714–15).

Shortly thereafter, in April 2019, Dr. Poitier found that Ms. McDaniel's impairments meet the criteria for Listing 12.15, for trauma- and stressor-related disorders, based on medical documentation demonstrating (1) exposure to actual or threatened death, serious injury, or violence; (2) subsequent involuntary re-experiencing of the traumatic event; (3) avoidance of external reminders of the event; (4) disturbance in mood and behavior; and (5) increases in arousal and reactivity, and marked limitations in the paragraph B criteria, including the ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage oneself. (R. 716–17).

At a follow-up session with Dr. Poitier in May 2019, Ms. McDaniel reported "doing okay," and Dr. Poitier found no evident signs of depression or mood elevation. (R. 806).

Later, however, in September 2019, Ms. McDaniel reported she remained depressed and withdrawn. (R. 809). Dr. Poitier observed that Ms. McDaniel's body posture and attitude convey an underlying depressed mood, and he found signs of anxiety during the session. *Id.* Four months later, at a follow-up session in January 2021, Ms. McDaniel denied all psychiatric symptoms, including depression or anxiety, and Dr. Poitier observed no signs of depression, mood elevation, or anxiety. (R. 874–75).

In March 2021, Dr. Poitier spoke with Ms. McDaniel over the phone for a follow-up appointment regarding medication management. (R. 876–77). Ms. McDaniel reported she was doing well since the last visit, her appetite was "excellent," and she was getting enough sleep every day. *Id.* Dr. Poitier continued to prescribe the same medication regimen. *Id.* At a telehealth appointment with Dr. Poitier two months later, in May 2021, Ms. McDaniel reported that she remains depressed, and she has tingling and numbing in her feet and hands and cannot stand for long. (R. 878). Dr. Poitier observed that Ms. McDaniel appeared glum, doleful, wary, and unhappy, and noted signs of anxiety, and he changed the anti-depressant medication from Celexa to Cymbalta. *Id.*

**4.  Opinions And Evaluations Of Podiatrist James Green**

Ms. McDaniel was also treated for her foot pain by James Green, DPM, a podiatrist. At her initial consultation with Dr. Green on September 11, 2018, Dr. Green found pain on palpitation of the plantar arch on both feet, diagnosed Ms. McDaniel with plantar fasciitis on the left foot, and administered a Dexamethasone injection. (R. 704). He recommended local ice massage to the affected foot daily, taping of the left foot, and an ankle foot support strapping. *Id.* Approximately two weeks later, Ms. McDaniel returned to a follow-up appointment with Dr. Green and expressed frustration, stating, "I didn't get any relief. The pain is still there." (R. 703). Dr. Green noted there was no improvement following the

injection and discussed other treatment options, including steroid medication. *Id.* The following month, in October 2018, Ms. McDaniel reported she was "still in pain." (R. 702). Dr. Green's treatment notes indicate the steroid pack was partly effective and that Ms. McDaniel was willing to try other treatment options, including wearing a CAM boot. *Id.*

Ms. McDaniel returned for a follow-up appointment with Dr. Green four months later, in February 2019, and reported that the injection administered at the prior appointment "only helped for a couple of days." (R. 701). Dr. Green recommended taping the left foot and ankle and prescribed Rayos. *Id.* The following month, Ms. McDaniel returned for a follow-up appointment and stated, "I still have pain," and she reported the taping helped but that she did not respond to the Rayos prescription. (R. 700). Dr. Green prescribed Gabapentin since Ms. McDaniel was "not in favor of receiving any more injections." *Id.*

On March 29, 2019, Dr. Green completed a Residual Functional Capacity ("RFC") Questionnaire on behalf of Ms. McDaniel. (R. 686–87). Dr. Green diagnosed Ms. McDaniel with bilateral pain in her feet and opined that her condition has neither lasted nor is expected to last at least twelve months. *Id.* According to Dr. Green's assessment, Ms. McDaniel's prognosis is good, and her chief symptom is pain ranging from "mild to moderate." *Id.* Dr. Green opined that Ms. McDaniel can sit for two hours at one time and stand for thirty minutes, and she would need to take unscheduled breaks four times a day for fifteen minutes during an 8-hour workday. *Id.* Dr. Green concluded that Ms. McDaniel's impairments will not produce "good days" and "bad days" and that she did not have other limitations or side effects that would affect her ability to work a regular job on a sustained basis. *Id.*

In October 2019, Ms. McDaniel presented at a follow-up appointment with Dr. Green still in pain after having tried immobilization with the CAM boot for three weeks on each foot. (R. 855). Dr. Green's assessment indicates Ms. McDaniel has "recalcitrant" plantar

fasciitis bilateral and that injections and medications have not been effective. *Id.* He discussed other treatment options, including surgery, which Ms. McDaniel declined, as well as a biologic injection, which she was willing to consider. *Id.* Dr. Green's treatment note from February 2020 indicates that Ms. McDaniel presented for a follow-up appointment with pain in her feet and reported the pain as seven on a scale of 1–10. (R. 854). Dr. Green noted that Ms. McDaniel's condition has been resistant to conservative treatments but that Ms. McDaniel "has not exhausted all her options either," and he again discussed surgical and non-surgical treatment alternatives. *Id.*

Ms. McDaniel returned to see Dr. Green three months later, in May 2020, and received a left foot injection for her plantar fasciitis. (R. 853). Three weeks later, Ms. McDaniel reported that her left foot "feels about 75% better," and she indicated she wanted an injection for the right foot. (R. 852). Dr. Green observed pain to palpitation of the plantar arch and fascia of the right foot and less pain to the plantar arch of the left foot after the injection. *Id.* Ms. McDaniel labeled her pain as a "5 on the left and 7 on the right" foot. *Id.* She received an injection on her right foot and was fitted for orthotics, which she tried at the appointment and reported they felt good. *Id.*

Dr. Green completed a second RFC Questionnaire on February 6, 2020 (R. 838–40). This time, he diagnosed Ms. McDaniel with chronic plantar fasciitis and noted that her pain was "moderate." *Id.* Unlike his first RFC Questionnaire, Dr. Green now reported that Ms. McDaniel's impairments have lasted or can be expected to last at least twelve months and that she will frequently require unscheduled breaks if she has a job that requires standing and walking for an 8-hour period but that if she sits "it is not a big problem." *Id.* Dr. Green opined that Ms. McDaniel's impairments are likely to produce "good days" and "bad days" and that she is likely to be off task more than 15% during an 8-hour workday. (R. 839).

### 5. Opinions And Evaluations of Neurologist Leonard Cohen

Dr. Stearns referred Ms. McDaniel for evaluation by Leonard Cohen, M.D., a neurologist, regarding symptoms of ataxia. (R. 719–46). At the initial consultation in December 2018, Dr. Cohen reviewed the results of Ms. McDaniel's brain MRI and found that she has some microvascular disease, which he described was "minimal" and did not "account for her symptoms." (R. 744–45). Dr. Cohen observed that Ms. McDaniel appeared alert, pleasant, and cooperative, that her mood was appropriate, and that her attention span and concentration were intact. *Id.* Dr. Cohen diagnosed Ms. McDaniel with cerebral microvascular disease, ataxia, and disorientation, and scheduled further diagnostic testing. (R. 740–42).

Ms. McDaniel returned to see Dr. Cohen at a follow-up visit in January 2019. (R. 736). At that visit, Dr. Cohen found that Ms. McDaniel has moderate depression based on screening questions. *Id.* Dr. Cohen diagnosed bilateral carpal tunnel syndrome ("CTS") and scheduled nerve conduction studies, which revealed there is no evidence for bilateral median or ulnar nerve dysfunction in the upper extremities. (R. 738, 733–34). Dr. Cohen's progress notes from a follow-up visit three weeks later indicate that Ms. McDaniel was seeing a psychiatrist and a psychologist regarding a traumatic experience when she was young and that she "got an attorney because she wants to go on to early disability." (R. 729). Dr. Cohen noted that Ms. McDaniel's EEG results and nerve conduction studies were normal and showed no evidence for CTS. (R. 731).

In October 2019, Ms. McDaniel returned to see Dr. Cohen for a follow-up visit during which she complained of intermittent pain, numbness, and pins and needles in the arms and legs. (R. 725–28). Dr. Cohen scheduled an MRI scan of Ms. McDaniel's cervical spine and nerve conduction studies of her lower extremities. *Id.* At a follow-up visit four weeks later,

Dr. Cohen observed that the MRI scan of the cervical spine indicated some cervical disc degeneration and spondylosis at C3-4 and some spinal stenosis, with mild progression compared to a prior study. (R. 719–22). He explained there was no need for surgical intervention. *Id.*

### 6.   Opinions And Evaluations of Podiatrist Stephen Wigley IV

The record indicates that Ms. McDaniel was also seen and treated by podiatrist Stephen Wigley, DPM, in April 2021. (R. 856–58). Dr. Wigley's notes reflect that Ms. McDaniel presented with complaints of "foot pain to the plantar aspect and to the insertion of the Archilles tendon" and that she reported pain in her feet for the past three years. (R. 856). Ms. McDaniel stated she has "tired feet" even if she is not on her feet all day and that she had seen another podiatrist who gave her medication and over-the-counter orthotics which did not relieve the pain. *Id.* Dr. Wigley's treatment notes indicate that Ms. McDaniel appeared well nourished, with a normal weight, and was oriented to time, place, and person. *Id.* Dr. Wigley observed "no instability of ankles; normal toe stability; no mass on foot; [and] no deformity of feet." *Id.* Dr. Wigley diagnosed Achilles tendinitis, prescribed Diclofenac, and recommended stretching exercises. (R. 858).

### 7.   State Agency Consultants' Opinions

The record contains a medical assessment from Coris Oliver, M.D., a state agency medical consultant, at the reconsideration level. (R. 152–62). Dr. Oliver opined that Ms. McDaniel did not have a severe physical impairment. *Id.*

The record also contains medical assessments completed by two state agency psychological consultants: James Levasseur, Ph.D., and James G. Brown, Ph.D. (R. 142–49, 152–62). At the initial and reconsideration levels, the state agency psychological consultants opined that Ms. McDaniel's depression and anxiety were non-severe impairments. *Id.* They

found that she had mild limitations in the paragraph B criteria and that there was no evidence in the record to establish the presence of the paragraph C criteria. *Id.* At the reconsideration level, Dr. Brown noted that while Ms. McDaniel alleges worsening of mental status, given her education, work history, and ADLs, there is no convincing evidence of a mental impairment that prevents her from working at a full-time job. (R. 160).

### D. Vocational Experts' Testimony

Three vocational experts ("VE") testified regarding Ms. McDaniel's past relevant work, each at one of the three separate hearings before the ALJ. Because one of the issues raised by Ms. McDaniel relates to the ALJ's finding that she could perform her past relevant work and was therefore not disabled, the testimony of the three VEs is summarized below.

#### 1. VE Heidi Feder

At the first hearing, VE Heidi Feder, a rehabilitation counselor, opined that Ms. McDaniel's past relevant work fell under the Dictionary of Occupational Titles ("DOT") as a Maintenance Supervisor, DOT code number 891.137-010, performed at the light exertional level with a specific vocational level ("SVP") of seven. (R. 130–34).

During the hearing, the ALJ presented VE Feder with three hypotheticals based on individuals with similar limitations as Ms. McDaniel and asked if any of the individuals could perform Ms. McDaniel's past relevant work. (R. 134–36). When asked by the ALJ if a hypothetical individual with the same medical, educational, and vocational profile as Ms. McDaniel and with the ability to perform a full range of light work could perform Ms. McDaniel's past relevant work, VE Feder answered yes. *Id.* When presented with the second hypothetical individual with the same medical, educational, and vocational profile as Ms. McDaniel who can perform a full range of light work; can stand and walk, combined, four of eight hours; can never climb ladders, ropes, or scaffolds; can never work at unprotected

heights; can frequently reach in all directions; and can frequently handle, finger, and feel, the VE opined that this individual would not be able to perform Ms. McDaniel's past relevant work. *Id.* When asked by the ALJ whether such individual has transferable skills to other light work, the VE answered no. *Id.* When presented with a third hypothetical individual with the same limitations as the second hypothetical individual modified to include the ability to perform simple and routine tasks; who can make simple work-related decisions; and who can occasionally interact with coworkers, supervisors, and the public, the VE testified that this individual would not be able to perform Ms. McDaniel's past relevant work. *Id.*

### 2.  VE Rebecca Balter

At the second hearing, after remand from the Appeals Council, VE Rebecca Balter, a vocational counselor, determined that Ms. McDaniel's past relevant work was a composite of two different job classifications: Residence Supervisor, DOT code 187.167-186, and Department Manager, DOT code 189.167-022, both performed at the light exertional level. (R. 81–93).[3]

The ALJ presented VE Balter with two hypothetical individuals at the second hearing. (R. 93–94). The first hypothetical individual had the same medical, educational, and vocational profile as Ms. McDaniel with the ability to perform a full range of sedentary work; who can never climb ladders, ropes, or scaffolds; can never work at unprotected heights; and can frequently handle, finger, and feel. *Id.* When asked by the ALJ if this hypothetical individual could perform Ms. McDaniel's past relevant work, the VE answered yes, but only as that work is generally performed. *Id.* When presented with the second hypothetical

---

[3] VE Balter reached this determination after further questioning by both the ALJ and Ms. McDaniel's attorney regarding whether the "Residence Supervisor" classification best described Ms. McDaniel's past relevant work as well as additional testimony from Ms. McDaniel regarding her specific job duties. (R. 82–91).

individual with the same limitations as the first hypothetical individual and with the additional limitation that the individual can concentrate in two-hour increments sufficiently to complete an eight-hour workday, VE Balter testified that such individual would be precluded from performing Ms. McDaniel's past relevant work and would be limited to unskilled work. *Id.*

### 3. VE Janice Bending

At the third hearing set by the ALJ to take additional vocational expert testimony, VE Jan Bending, Ph.D., a private counselor, classified Ms. McDaniel's past relevant work as a File Supervisor, DOT code 206.137.010, performed at the light exertional level with an SVP of seven. (R. 44–45).

During the hearing, the ALJ presented VE Bending with four hypothetical individuals and asked if any could perform Ms. McDaniel's past relevant work. (R. 47–50). In the first hypothetical, when asked by the ALJ whether an individual with Ms. McDaniel's medical, educational, and vocational profile who can perform a full range of light work, can frequently climb ladders, ropes, or scaffolds, and can frequently handle, finger, and feel, could perform Ms. McDaniel's past relevant work, the VE answered yes. *Id.* For the second hypothetical, the ALJ included the same limitations as the first hypothetical individual modified to performing sedentary work. *Id.* The VE testified that such individual would not be able to perform Ms. McDaniel's past relevant work. *Id.*

The ALJ's third hypothetical individual had the same limitations as the first hypothetical individual with the additional limitation that the individual can concentrate in two-hour increments sufficiently to complete an eight-hour workday. *Id.* VE Bending opined that such individual would still be able to perform Ms. McDaniel's past relevant work as actually performed by her. *Id.* The ALJ asked VE Bending if the additional limitation on

concentration he presented in the third hypothetical would limit the individual to unskilled work, and the VE answered no. *Id.* The ALJ then asked whether an individual with the same limitations as the first hypothetical individual who would be off task more than ten percent of an eight-hour workday could perform Ms. McDaniel's past relevant work, to which VE Bending answered no because such individual would not be employable. *Id.*

## II.    PROCEDURAL HISTORY

Ms. McDaniel applied for a period of disability and disability insurance benefits on July 27, 2018, alleging disability beginning on January 31, 2018. (R. 422–25). Her applications were initially denied on August 28, 2018, and again, upon reconsideration, on October 19, 2018. (R. 190–91, 195–96). Ms. McDaniel then requested a hearing, which was held before ALJ Celaya on November 22, 2019. (R. 205, 104–40). On December 11, 2019, the ALJ issued an unfavorable decision finding Ms. McDaniel was not disabled under the Social Security Act from January 31, 2018, through the date of the decision (the "Initial Decision"). (R. 168–78). Ms. McDaniel requested review of the ALJ's Initial Decision. (R. 265–66).

On November 9, 2020, the Appeals Council granted the request for review under the substantial evidence provision of the Social Security Administration regulations, 20 C.F.R. § 404.970, vacated the ALJ's Initial Decision, and remanded the case to the same ALJ to: (1) give further consideration of Ms. McDaniel's "maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations"; (2) give further consideration to whether Ms. McDaniel "has past relevant work and, if so, can perform it"; and (3) "[o]btain supplemental evidence from a vocational expert to determine whether [Ms. McDaniel] has acquired any skills that are transferable with very little, if any, vocational adjustment to other occupations under the guidelines in Social Security Ruling 82-41." (R. 184–87).

Ms. McDaniel requested a second hearing, which was held before the ALJ on June 2, 2021. (R. 52–103). On August 13, 2021, the ALJ held a third hearing to obtain additional vocational expert testimony. (R. 35–51). Thereafter, on September 23, 2021, the ALJ issued a decision again finding that Ms. McDaniel was not disabled under Section 1614(a)(3)(A) of the Social Security Act from January 31, 2018, through the date of the decision (the "Decision"). (R. 14–27). Ms. McDaniel requested review of the ALJ's Decision. (R. 412–13). On February 28, 2022, the Appeals Council denied her request for review, rendering the ALJ's Decision as the Commissioner's "final" determination. (R. 1–3); *See also* 42 U.S.C. § 405(g); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).

Having exhausted her administrative remedies, on April 18, 2022, Ms. McDaniel filed a Complaint seeking judicial review of the Decision. [ECF No. 1]. The administrative record was filed on August 29, 2022. [ECF No. 14]. Thereafter, Ms. McDaniel filed a Motion for Summary Judgment on October 31, 2022. [ECF No. 17]. The Commissioner filed a Motion for Summary Judgment and Response to Ms. McDaniel's Motion for Summary Judgment on January 17, 2023, and on February 16, 2023, Ms. McDaniel filed her Reply. [ECF Nos. 20, 23].

Both parties' Motions are fully briefed and ripe for adjudication.

### III.   THE SEQUENTIAL EVALUATION PROCESS

Eligibility for disability insurance benefits requires that the claimant be disabled. 42 U.S.C. §§ 423(a)(1)(E), 1382(a)(1). A claimant is disabled if she is unable to engage in substantial gainful activity by reason of a medically determinable impairment that can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Bacon v. Comm'r of Soc. Sec.*, 861 F. App'x 315, 317 (11th Cir. 2021). A plaintiff bears the burden of proving she

is disabled within the meaning of the Social Security Act. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); 20 C.F.R. §§ 404.1512(a), 416.912(a).

The Social Security regulations outline a five-step sequential evaluation process for deciding whether a claimant is disabled. *Brightmon v. Soc. Sec. Admin., Comm'r*, 743 F. App'x 347, 351 (11th Cir. 2018); 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v). At step one of this process, the ALJ must determine whether the claimant is unable to engage in substantial gainful activity ("SGA"). *See* 20 C.F.R. § 404.1520(b). Generally, if a claimant's labor earnings are above a specific level set out in the regulations, it is presumed that she has demonstrated the ability to engage in SGA. 20 C.F.R. §§ 404.1574, 404.1575. If a claimant can engage in SGA, the ALJ will find that she is not disabled. 20 C.F.R. § 404.1571.

At step two, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment or combination of impairments is severe if it significantly limits an individual's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). If the claimant's impairment or combination of impairments does not significantly limit her physical or mental ability to do basic work activities, the ALJ will find that the impairment is not severe, and that the claimant is not disabled. *Id.* If the claimant has a severe impairment or combination of impairments, the analysis proceeds to step three. *Id.*

In the third step, the ALJ must determine whether the claimant's impairment or combination of impairments is of a severity that meets or medically equals the criteria of an impairment in the Listing of Impairments. 20 C.F.R. Pt. 404, Subpt. P. App. 1. If so, the claimant is disabled. *Id.* If not, the analysis proceeds to the next step. *Id.* Before considering step four, however, the ALJ must first determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(e). A claimant's RFC is her ability to do physical and mental

23

work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 404.1545. The ALJ must make this determination while stating "with particularity the weight given to different medical opinions and the reasons therefor." *Buckwalter v. Acting Comm'r of Soc. Sec.*, 5 F.4th 1315, 1321 (11th Cir. 2021) (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011)).

At step four, the ALJ must determine whether the claimant can perform her past relevant work, in light of her RFC. 20 C.F.R. § 404.1520(f). Past relevant work means work performed (either in the manner claimant actually performed it or as it is generally performed in the national economy) within fifteen years prior to the date claimant's disability must be established. 20 C.F.R. §§ 404.1560(b), 404.1565. If the claimant has the RFC to do her past relevant work, she is not disabled. 20 C.F.R. § 404.1520(f). If the claimant is unable to do any past relevant work, the analysis proceeds to the final step.

At the fifth and final step, the ALJ must determine whether the claimant is able to do any other work considering her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g). If the claimant can do other work, she is not disabled. *Id*. If she is unable to do other work, she is disabled. *Id*. At step five, the burden temporarily shifts to the Commissioner to show the existence of other jobs in significant numbers in the national economy that the claimant can perform, given her impairments. 20 C.F.R. §§ 404.1512, 404.1560(c). The ALJ makes this determination by considering both the Dictionary of Occupational Titles and testimony from an impartial vocational expert. *See Buckwalter*, 5 F.4th at 1321.

## IV.   THE ALJ'S DECISION

In the September 23, 2021 Decision, the ALJ concluded that Ms. McDaniel was not disabled within the meaning of the Social Security Act from January 31, 2018, through the

date of his decision. (R. 15). In reaching this decision, the ALJ applied the five-step sequential evaluation process to Ms. McDaniel's claim for benefits. (R. 15–27).

At step one, the ALJ found that Ms. McDaniel had not engaged in substantial gainful activity since January 31, 2018. (R. 17). And at step two, the ALJ determined that Ms. McDaniel's "degenerative disc disease of the cervical spine; plantar fasciitis; and Achilles tendinitis" are severe impairments that significantly limit her ability to perform basic work activities. (R. 17). The ALJ also found that Ms. McDaniel has non-severe impairments that have no more than a minimal impact on her daily functioning, including "hypertension, thyroid nodule, cerebral microvascular disease, ataxia, bilateral carpal tunnel syndrome ("CTS"), major depressive disorder, anxiety, and PTSD." *Id.*

At step three, the ALJ considered the listing requirements and determined that Ms. McDaniel "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in 20 C.F.R. pt. 404, subpt. P, app. 1.[4] (R. 20). The ALJ then determined that Ms. McDaniel has the RFC to "perform light work as defined in 20 CFR 404.1567(a) [sic] except frequently climb ladders, ropes or scaffolds; and frequently handle, finger and feel." *Id.* The ALJ did not consider Ms. McDaniel's mental impairments, including depression or anxiety, in determining the RFC.

At step four, the ALJ accepted VE Bending's testimony that Ms. McDaniel could perform past relevant work as a file supervisor and found that such work "does not require the performance of work-related activities precluded by the claimant's [RFC]." (R. 25–26).

---

[4] The Listing of Impairments is a predetermined set of "major body systems impairments that [are considered] severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience" that would render an individual disabled. 20 C.F.R. § 416.925(a). An individual's impairment is "medically equivalent to a listed impairment . . . if it is at least equal in severity and duration to the criteria of any listed impairment." *Id.* § 416.926(a); *see also id.* § 416.920(d).

The ALJ concluded that "[i]n comparing the claimant's [RFC] with the physical and mental demands of this work, . . . [Ms. McDaniel] is able to perform the job as it is generally performed." (R. 27). The ALJ did not proceed to step five.

## V.    STANDARD OF REVIEW

The Court's review is limited to determining whether the ALJ's decision is supported by substantial evidence and whether the correct legal standards were applied. *See* 42 U.S.C. § 405(g); *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1257 (11th Cir. 2019). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). A court must defer to the ALJ's decision if it is supported by substantial evidence, even if the preponderance of the evidence weighs against it. *Id*. The Court may not redecide facts, reweigh the evidence, or substitute its judgment for that of the ALJ. *Id*. Although factual findings enjoy such deference, the ALJ's legal analysis and conclusions are reviewed *de novo*. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007).

The ALJ "has a basic obligation to develop a full and fair record" to enable the reviewing court "to determine whether the ultimate decision on the merits is rational and supported by substantial evidence." *O'Bier v. Comm'r of Soc. Sec. Admin.*, 338 F. App'x 796, 798 (11th Cir. 2009) (quoting *Welch v. Bowen*, 854 F.2d 436, 440 (11th Cir. 1988)). In determining whether the ALJ has failed to develop the record fully, the reviewing court should be guided by "whether the record reveals evidentiary gaps that result in unfairness or clear prejudice." *Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995) (quoting *Smith v. Schweiker*, 677 F.2d 826, 830 (11th Cir. 1982)). "The lack of medical and vocational documentation supporting an applicant's allegations of disability is undoubtedly prejudicial to a claim for benefits." *Id.* at 935–36. As the Eleventh Circuit explained: "We have no way of knowing

26

whether the evidence missing from [a particular] case would sustain [the claimant's] contentions of her inability to work. In the absence of proof to the contrary, however, we must assume that it does lend credence to her allegations." *Id.*

## VI.    DISCUSSION

Ms. McDaniel raises five overarching issues with the ALJ's Decision in her Motion. She argues that the ALJ's Decision should be reversed or that the matter should be remanded for further administrative proceedings because the ALJ (1) failed to properly analyze the physical and mental demands of Ms. McDaniel's past relevant work as required by Social Security Ruling ("SSR") 82-62; (2) failed to properly consider and appropriately analyze other relevant evidence; (3) rejected all treating medical source opinions without sufficient justification; (4) reached a functional assessment that is not supported by substantial evidence or by either a treating or examining medical source; and (5) improperly characterized Ms. McDaniel's treatment history as non-compliant and generally conservative. The Commissioner's response to each of these challenges is addressed below.

### A.   *The ALJ's Findings Regarding Ms. McDaniel's Past Relevant Work*

Ms. McDaniel argues the ALJ's finding that she has past relevant work as a file supervisor and that she can perform and sustain that past work is erroneous and not supported by substantial evidence. Mot. at 6. She asserts the ALJ failed to properly analyze the physical and mental demands of her past work, as required by SSR 82-62. *Id.* Additionally, Ms. McDaniel argues the evidence shows that her past relevant work qualifies as a composite job, and the VE's job classification of file supervisor does not adequately incorporate all of her work requirements as she performed them. *Id.* at 7–8. The Commissioner argues that Ms. McDaniel failed to argue below or prove that her past relevant work was a composite job. Resp. at 6–8.

### 1.   Whether Ms. McDaniel's Past Relevant Work Constitutes A Composite Job

As noted by the Commissioner, Ms. McDaniel has the burden to show that her previous work was a composite job. *Rapak v. Kijakazi*, No. 21-14473-CIV, 2022 WL 17144457, at *3 (S.D. Fla. Nov. 22, 2022) (Maynard, J.) (citing *Smith v. Comm'r of Soc. Sec.*, 743 F. App'x 951, 954 (11th Cir. 2018)). "A composite job is one that has 'significant elements of two or more occupations and, as such, [has] no counterpart in the [DOT].'" *Smith*, 743 F. App'x at 954 (quoting SSR 82-61 at *2). "Past relevant work may qualify as a composite job 'if it takes multiple DOT occupations to locate the main duties of the [past relevant work] as described by the claimant.'" *Id.* (citing Program Operations Manual System ("POMS") DI 25005.020).

The ALJ found that Ms. McDaniel has past relevant work as a "file supervisor" based on her testimony, work history reports, and earning records. (R. 26). The ALJ also relied upon the testimony of VE Bending who considered Ms. McDaniel's specific job duties at the third hearing. (R. 40–42). In the Response, the Commissioner points out that, at the hearing, Ms. McDaniel's attorney proffered the DOT occupation of file supervisor, and the VE agreed with that classification. *Id.* The Commissioner asserts that Ms. McDaniel failed to object at the hearing to the VE's classification of her past work as file supervisor. *Id.*

In her Reply, Ms. McDaniel contends that a review of the hearing transcript shows that Ms. McDaniel's counsel suggested other possible job classifications that encompassed various aspects of Ms. McDaniel's past work and did not agree to any specific job classification. Reply at 4. While it may be true that counsel suggested other job classifications, the record reflects that Ms. McDaniel did not specifically challenge the VE's classification of her past work as a file supervisor rather than a composite job.

Several courts have found that a claimant's failure to object or raise an argument before the ALJ relative to her past relevant work forecloses the claimant's ability to raise the issue

for the first time on appeal. *See New v. Comm'r of Soc. Sec.*, No. 5:12-CV-211-OC-18PRL, 2013 WL 3804846, at *3 (M.D. Fla. July 8, 2013) ("As an initial matter, the Commissioner correctly notes that the Plaintiff did not raise this issue to the ALJ, nor did her attorney object to the VE's testimony identifying Plaintiff's prior work as a housekeeper as past relevant work. Unfortunately for Plaintiff, because she failed to raise this issue to the ALJ or even object to the VE's testimony, the ALJ was not obligated to specifically address the concerns—or rather, arguments—that Plaintiff now raises."); *Schmidt v. Comm'r of Soc. Sec.*, No. 2:17-cv-333, 2018 WL 3805863, at *6 (M.D. Fla. Aug. 10, 2018) (holding the ALJ did not err in defining the claimant's past relevant work as including the position of accounting clerk where the claimant did not object to the VE's testimony that her past relevant work included that job). The undersigned agrees that because Ms. McDaniel did not challenge the VE's classification of her past relevant work as file supervisor, the ALJ did not err in classifying her past work as such.

Without an objection or other reason to doubt her credibility, the VE's experience provides substantial evidence to support the ALJ's reliance on the VE's testimony. *See Curcio v. Comm'r of Soc. Sec.*, 386 F. App'x 924, 926 (11th Cir. 2010). Therefore, Ms. McDaniel waived the argument that her past relevant work constituted a composite job, and the ALJ's determination that her previous work can be classified as file supervisor is supported by substantial evidence.

### 2. Failure To Properly Analyze Past Relevant Work Under SSR 82-62

As noted above, at step four, a claimant will be found not disabled if she can return to her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). To determine whether a claimant can perform her past relevant work, "the ALJ must consider the specific duties of the claimant's past work and evaluate the claimant's ability to perform them in spite of her impairments."

*Barrio v. Comm'r of Soc. Sec.*, 394 F. App'x 635, 637 (11th Cir. 2010) (citing *Lucas v. Sullivan*,

918 F.2d 1567, 1574 (11th Cir. 1990)). The claimant bears the burden of showing her inability

to perform past work. *See Moore*, 405 F.3d at 1211.

SSR 82–62 explains that "[t]he RFC to meet the physical and mental demands of jobs

a claimant has performed in the past (either the specific job a claimant performed or the same

kind of work as it is customarily performed throughout the economy) is generally a sufficient

basis for a finding of 'not disabled.'" SSR 82–62, 1982 WL 31386, at *3. SSR 82-62 also

explains the importance of developing the record with respect to whether a claimant can

perform her past relevant work:

> The decision as to whether the claimant retains the functional capacity to
> perform past work which has current relevance has far-reaching implications
> and must be developed and explained fully in the disability decision. Since this
> is an important and, in some instances, a controlling issue, every effort must be
> made to secure evidence that resolves the issue as clearly and explicitly as
> circumstances permit.

*Id.* Therefore, when determining whether a claimant has the ability to perform her past

relevant work, the ALJ's decision must explicitly contain findings of fact as to the claimant's

RFC; the physical and mental demands of the past work; and whether the claimant's RFC

would permit a return to the past relevant work. *Id.* at *4. The ALJ may rely on a VE's

testimony regarding the physical and mental demands of the claimant's past work. 20 C.F.R.

§ 404.1560(b)(2). The ALJ may also consider the job descriptions set forth in the DOT. *Id.*

Here, the ALJ found that Ms. McDaniel is capable of performing her past relevant

work as file supervisor as it is generally performed in the national economy. (R. 27). The

ALJ's entire discussion with respect to this determination is as follows:

> Vocational expert Dr. Janice L. Bending testified that, based on the DOT, her
> education and experience, a person of the claimant's age, educational,
> vocational background and residual functional capacity . . . is able to perform
> her past relevant work as a <u>File Supervisor</u>, as generally performed. Pursuant
> to SSR 00-4p, I find that the vocational expert's testimony is consistent with

> the DOT and/or based on her expertise. In comparing the claimant's residual
> functional capacity with the physical and mental demands of this work, I
> further find that she is able to perform the job as it is generally performed.

*Id.* (emphasis in original). Without more, this explanation of the ALJ's determination that

Ms. McDaniel is capable of performing her past relevant work is insufficient and does not

comport with SSR 82–62's requirement that the ALJ make specific findings of fact. *See, e.g.,*

*Rodriguez v. Kijakazi*, No. 21-cv-21098, 2022 WL 3371570, at *7–10 (S.D. Fla. July 22, 2022)

(Louis, J.), *report and recommendation adopted* 2022 WL 3370788 (S.D. Fla Aug. 16, 2022)

(Lenard, J.); *Perez v. Comm'r of Soc. Sec.*, No. 2:14-cv-2-FtM-CM, 2015 WL 1277832, at *5–6

(M.D. Fla. Mar. 20, 2015); *Johnson v. Comm'r of Soc. Sec.,* No. 6:12–cv–123–Orl–GJK, 2013

WL 461278, at *6 (M.D. Fla. Feb. 7, 2013) (holding that a conclusory determination of a

claimant's ability to perform past relevant work, without analyzing the physical and mental

demands of the position, required a reversal and sentence four remand).

      Thus, a review of the ALJ's development of this issue on the record at the hearings is

warranted. Ms. McDaniel argues that the ALJ made "[n]o attempt whatsoever . . . to compare

any specific work functions of Ms. McDaniel's past work as she actually performed it with

[her] specific impairments and how those impairments might affect her performance of those

tasks." Mot. at 9. She asserts that, at this stage, the ALJ's finding requires an "explicit

accounting" of the evidence in the decision, and "[i]mplied findings are not sufficient." *Id.*

      In response, the Commissioner argues that Ms. McDaniel failed to meet her burden

of proving that she could not perform her past relevant work as a file supervisor. Resp. at 4–

8. As noted in Ms. McDaniel's Reply, the Commissioner's Response focuses on Ms.

McDaniel's argument that her past relevant work was a composite job and does not address

her argument that the ALJ failed to adequately assess the physical and mental demands of her past relevant work as required by SSR 82-62.[5]

Although, the ALJ's Decision summarizes Ms. McDaniel's testimony from the three administrative hearings about her past work at the domestic violence shelter (R. 25–26), the final hearing transcript demonstrates that the ALJ did not make an effort to analyze the physical and mental demands of her past work as she performed it. Instead, the ALJ asked cursory questions about Ms. McDaniel's past work so that the VE could identify the corresponding DOT job classification:

> **ALJ**: Okay. So can you describe that job for the vocational expert again? Tell us what you did?
> …
> **ALJ**: Tell her -- describe your job title and tell her what you did during a workday.
> **Ms. McDaniel**: Okay. I was an administrative officer and that includes supervising of the clerical and maintenance staff, ordering supplies, ordering food, personnel person, human resources person. I conduct[ed] training. I guess the general office duties.
> . . .
> **Attorney**: Could she be permitted to testify to [her] physical duties that she hasn't talked about?
> . . .
> **ALJ**: Well, how much did you lift and carry in that job, ma'am? What's the most you had to lift or carry?
> **Ms. McDaniel**: A case of paper for the computer or for the copier.
> **ALJ**: Okay. So how much would you estimate the paper weighed?
> **Ms. McDaniel**: Like about 20.
> **ALJ**: Okay. All right.
> **Ms. McDaniel**: And of course, that goes with the order, you know, milk and vegetables, you know, things such as that.
> **ALJ**: All right. And [VE] Dr. Bending, do you have some questions?
> **VE**: The only question I have on this is I understand that you were a domestic violence supervisor, but did you supervise the domestic violence counselors?
> **Ms**. **McDaniel**: No. The clerical and the maintenance staff.
> . . .
> **ALJ**: …[Attorney], I know you had some thoughts on how the job might be characterized.

---

[5] Indeed, the Commissioner does not even refer to SSR 82-62 in the Response.

> **Attorney**: Yes. I wanted my client to tell the vocational expert about the building. It was a three-story building and her needs to do -- conduct inspections.
> **ALJ**: Okay. All right.
> **ALJ**: So can you talk a little bit about that, Ms. McDaniel?
> **Ms**. **McDaniel**: Yes, sir. Like I said one of my duties was to supervis[e] the maintenance staff and I had to go like every hour, every two hours . . . on each floor to make sure that the floors were, you know, always mopped, swept, the bathrooms cleaned and each of the resident's bedrooms were up to par and . . . the resident's kitchen as well. And like I said, I had to . . . walk the stairs and make sure the stairs were safe and clear.
> **ALJ**: And [Attorney], anything you want to ask the claimant or direct to the vocational expert?

(R. 40–42). The ALJ did not further develop the record or elicit further testimony from Ms. McDaniel on the specific physical and mental demands of her past relevant work as she performed it, for example, how long she would typically sit or stand during the course of an eight-hour workday, in order to adequately assess her ability to perform that work now. Nor did the ALJ elicit testimony from the VE regarding the DOT description for the job classification of file supervisor or quote the DOT description of that job as it is generally performed in his Decision. The ALJ also did not draw upon evidence from the medical record regarding how Ms. McDaniel's impairments did or did not limit her ability to perform the duties of her past relevant work either as she actually performed it or as it is generally performed.

Reviewing the record as a whole, including the ALJ's cursory explanation of his findings concerning Ms. McDaniel's ability to perform her past relevant work as a file supervisor and his failure to develop the record regarding Ms. McDaniel's work, the DOT's description of the job of a file supervisor, or Ms. McDaniel's impairments and how those are relevant to her ability to perform the work, the undersigned finds the ALJ's analysis of Ms. McDaniel's ability to perform her past relevant work is inadequate and falls short of the requirements outlined in SSR 82-62. *See Del Rosario-Castillo v. Astrue*, No. 09-61665-CIV, 2010

33

WL 3385508, at *12 (S.D. Fla. Aug. 9, 2010) (Snow, J.) (finding "the ALJ's abbreviated discussion of the plaintiff's ability to perform her past relevant work falls short of the full explanation and development and clear and explicit resolution mandated by SSR 82-62"), *report and recommendation adopted* 2010 WL 3385502 (S.D. Fla. Aug. 25, 2010) (Dimitrouleas, J.); *see also Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003) ("It is well-established that the ALJ has a basic duty to develop a full and fair record."); *Rodriguez*, 2022 WL 3371570, at *8–10.

Furthermore, SSR 82-62 explains that for "a claim involving a mental/emotional impairment," such as Ms. McDaniel's claim, "care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety," including "speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work." SSR 82–62, 1982 WL 31386, at *3. As discussed below, the ALJ's Decision is devoid of such analysis with respect to Ms. McDaniel's mental impairments, including depression, anxiety, and PTSD.

In sum, the undersigned finds the ALJ's analysis of the demands of Ms. McDaniel's past relevant work and her ability to perform her past relevant work fails to comport with the requirements of SSR 82–62, and, therefore, a remand for further analysis and consideration of her past relevant work in compliance with SSR 82-62 is warranted.

### 3.  Inconsistencies In The ALJ's Hypotheticals Presented to the VEs

As noted above, the ALJ presented several hypotheticals to three different VEs at three separate hearings to determine whether a person with Ms. McDaniel's limitations could perform her past relevant work. At the first and second hearings, the ALJ presented hypotheticals to the VEs based on an individual who "can never climb ladders, ropes, or

scaffolds" and "can never work at unprotected heights." (R. 134–36, 93–94). However, at the third hearing, the ALJ's hypothetical to the VE provided that the individual "can *frequently* climb ladders, ropes, or scaffolds." (R. 47) (emphasis added). In his Decision, the ALJ found that Ms. McDaniel had the capacity to perform light work "except frequently climb ladders, ropes or scaffolds; and frequently handle, finger and feel." (R. 20). Thus, there is an apparent inconsistency between the RFC description in the hypothetical posed to the VE at the third hearing as opposed to that posed at the first and second hearing.

When the ALJ relies on the testimony of a VE regarding a claimant's ability to perform past relevant work, "the key inquiry shifts to the adequacy of the RFC description contained in the hypothetical posed to the VE" rather than the RFC cited in the ALJ's decision. *Corbitt v. Astrue*, No. 3:07–cv–518–J–HTS, 2008 WL 1776574, at *3 (M.D. Fla. Apr. 17, 2008) (citation omitted). Therefore, the undersigned must determine whether the ALJ failed to include any limitations resulting from the claimant's severe impairments in the hypothetical question that formed the basis of the VE's testimony, and if so, whether such failure constitutes grounds for reversal.

Based on the hearing transcript and the prior hypotheticals presented by the ALJ to the VEs at the first two hearings, it is unclear whether the ALJ intended, at the third hearing, to include a limitation that Ms. McDaniel can "*never* climb ladders, ropes, or scaffolds." The transcript reflects, however, that he did not include that limitation at that hearing. If the ALJ's hypothetical failed to include this limitation, as reflected in the transcript, then, based on Ms. McDaniel's severe impairments, the hypothetical posed at the third hearing was inadequate and the ALJ could not properly rely upon the VE's testimony based on that hypothetical. *See Winschel*, 631 F.3d at 1181 (holding that a VE's testimony is not substantial evidence where

the ALJ's hypothetical failed to include or otherwise implicitly account for all of the claimant's impairments).

Because this inconsistency is not resolved in the ALJ's Decision, the undersigned finds that the record does not demonstrate that the ALJ's finding as to Ms. McDaniel's RFC and ability to perform past relevant work is supported by substantial evidence.[6] Therefore, remand is warranted to clarify the evidence supporting the ALJ's findings regarding Ms. McDaniel's ability to perform her past relevant work as file supervisor.

### B. The ALJ's RFC Determination

Ms. McDaniel argues that the ALJ's determination that Ms. McDaniel is able to perform work at the light level of exertion is not supported by substantial evidence. Mot. at 19. She also asserts the ALJ fails to support his RFC assessment with an appropriate medical source statement. *Id.* In response, the Commissioner argues the ALJ properly considered the relevant evidence and that the ALJ's evaluation of Ms. McDaniel's impairments and RFC assessment are supported by substantial evidence. Resp. at 8–12.

### 1. The ALJ's Review Of The Medical Evidence

Ms. McDaniel argues that the ALJ misstates, mischaracterizes, and fails to account for important medical evidence regarding her physical and mental impairments. Mot. 10–13. She asserts the ALJ's "selective" consideration of the evidence and failure to present an accurate factual basis for his findings results in an inadequate functional assessment and renders his decision incapable of judicial review. *Id.* at 13. In response, the Commissioner argues the ALJ properly considered the medical evidence in assessing Ms. McDaniel's RFC

---

[6] Even if the ALJ's failure to include this limitation in the hypothetical was harmless error, the undersigned finds there are separate grounds for why the ALJ's RFC determination is not supported by substantial evidence, as further discussed below.

and that Ms. McDaniel failed to show that substantial evidence does not support the ALJ's findings regarding her physical and mental impairments and RFC assessment. Resp. at 8–12.

In determining whether remand is necessary based on a claim that an ALJ failed to develop the record, the court considers whether the record as a whole reveals evidentiary gaps which result in unfairness or clear prejudice. *Ellison v. Barnhart*, 355 F. 3d 1272, 1275 (11th Cir. 2003). As explained above, the Court will not reweigh the evidence but only reviews for clear error or, here, for clear prejudice. *Id.* Thus, there must be a showing of prejudice before the court will find that the claimant's right to due process has been violated to such a degree that the case must be remanded. *Id.*

Ms. McDaniel argues that the ALJ's characterization of Dr. Poitier's treatment notes as "consistently benign" calls into question the ALJ's understanding of the medical evidence. Mot. at 11. According to Ms. McDaniel, while Dr. Poitier's treatment notes reflect periodic instances of normal mental status, the examination notes demonstrate Ms. McDaniel's fluctuating mental condition. *Id.* The Commissioner argues that Ms. McDaniel focuses on the few abnormalities and notations regarding her subjective statements about her condition. Resp. at 9.

In his Decision, the ALJ summarizes Dr. Poitier's treatment notes from March 2018 through May 2021 and opines that Dr. Poitier "consistently documents generally benign examination findings" regarding Ms. McDaniel's mental status. (R. 19). A review of the record reveals that Dr. Poitier's treatment notes reflect Ms. McDaniel's fluctuating mental condition, which the ALJ did not acknowledge aside from one comment that "Dr. Poitier noted she was sad and issued a major depressive disorder diagnosis." (R. 19). There are, however, numerous instances in which Dr. Poitier observes symptoms associated with Ms. McDaniel's mental condition. For example, in March 2019, Dr. Poitier observed Ms.

McDaniel's slowness of physical movement, speech, and thinking, reveal a depressed mood.[7] (R. 804). Similarly, in September 2019, Dr. Poitier observed that Ms. McDaniel's body posture and attitude convey an underlying depressed mood, and he found signs of anxiety during the session. (R. 809). In May 2021, Dr. Poitier observed that Ms. McDaniel appeared glum, doleful, wary, and unhappy, and noted signs of anxiety. (R. 878). The undersigned finds these observations constitute objective medical evidence of Ms. McDaniel's mental status, yet the ALJ altogether omitted these from his summary of Dr. Poitier's treatment notes. This is not a matter of the Court reweighing the evidence, this is a matter of the ALJ altogether failing to consider evidence. *See Martin v. Kijakazi*, No. No. 20-cv-10149, 2022 WL 17987332, at *8–9 n.10 (S.D. Fla. Sept. 28, 2022) (Becerra, J.) (reversing and remanding where the ALJ failed to consider evidence and noting that the issue was not that the ALJ failed to credit the evidence of potential mental limitations but that the ALJ failed to consider such evidence altogether).

Ms. McDaniel also points to the ALJ's misstatement regarding the number of therapy sessions she attended with Mr. Wiggins. Mot. at 10. In his Decision, the ALJ indicated that "during the *entire 3.5 year period at issue*, there is record of *no more than 5 therapy sessions, all between February and June 2018.*" (R. 18) (emphasis in original). As Ms. McDaniel correctly notes, the record contains treatment notes from at least thirteen (13) therapy sessions with Mr. Wiggins, from January 2018 through July 2019. (R. 594–602, 606–13, 781, 797). It is not clear from the Decision why the ALJ did not consider these additional treatment notes that were presented to him, but it is apparent that he did not consider them.

---

[7] During that same time, Mr. Wiggins observed Ms. McDaniel's mood as depressed, anxious, and angry. (R. 781). The ALJ, however, did not consider Mr. Wiggins's treatment notes after June 2018. (R. 18–19).

In response, the Commissioner acknowledges that Mr. Wiggins documented more adverse findings when he saw Ms. McDaniel but argues that the ALJ noted Ms. McDaniel's "actual therapy sessions as opposed to [her] simply visiting" Mr. Wiggins. Resp. at 9–10. The undersigned finds nothing in the record to differentiate between Ms. McDaniel's "actual therapy sessions" versus "visits" she made to Mr. Wiggins, and the Commissioner fails to offer any. Indeed, most of the documents in the record pertaining to Mr. Wiggins's evaluation of Ms. McDaniel are in the form of progress notes indicating Ms. McDaniel's presentation during the session, medications she was taking, a description and subjective report of her symptoms, and other relevant content noted by Mr. Wiggins during the sessions. The ALJ's failure to even acknowledge these treatment notes while affirmatively stating that they or some of them do not exist makes it extremely difficult for the Court to determine whether the ALJ's Decision is in fact supported by substantial evidence or whether the ALJ's Decision is instead supported by a faulty view of the evidence with gaps that prejudiced Ms. McDaniel.

Ms. McDaniel also challenges the ALJ's evaluation of the medical evidence relating to her physical impairments. She asserts that the ALJ further mischaracterizes the evidence in the record by stating that Ms. McDaniel did not mention any physical impairment in a Disability Report from July 2018. Mot. at 12. The Commissioner responds that the ALJ simply recited the facts as he reviewed them in the record and that substantial evidence supports the ALJ's evaluation of Ms. McDaniel's physical impairments. Resp. at 11–12.

As correctly noted by Ms. McDaniel, the record reflects that her physical impairments, including her degenerative disc disease of the cervical spine, plantar fasciitis, and Achilles tendinitis, which the ALJ determined were severe impairments, did not arise and were not medically assessed until after the July 2018 Disability Report was prepared. *Id.* As noted in the ALJ's Decision, Dr. Green diagnosed Ms. McDaniel with plantar fasciitis in September

2018 (R. 703); Dr. Cohen observed disc degeneration and stenosis on an MRI of the cervical spine in October 2019 (R. 719); and Dr. Wigley diagnosed Ms. McDaniel with Achilles tendinitis in April 2021 (R. 858). (R. 22–23). Therefore, it is of no consequence that Ms. McDaniel failed to mention any physical impairments in a Disability Report from July 2018 since there is objective medical evidence of her physical impairments in the record after July 2018. Thus, it is again unclear whether the ALJ completely overlooked this medical evidence or if he considered it but found it unpersuasive and, if so, why.

In sum, the ALJ fails to give proper explanations for his reliance on certain findings and evidence but not others, and he omits relevant medical evidence without explanation. As a result, the undersigned is unable to determine whether the ALJ properly considered the full record in reaching his findings or whether his findings are in fact supported by substantial evidence. Therefore, the undersigned recommends the Decision be reversed and remanded with instructions to accurately account for and evaluate all relevant medical records and evidence considered by the ALJ in making his determinations.

## 2. The ALJ's Findings Regarding The Opinions Of Ms. McDaniel's Treating Physicians

Ms. McDaniel argues that the ALJ erred by rejecting the opinions of her treating physicians, Dr. Green and Dr. Poitier, and her therapist, Mr. Wiggins, while exclusively relying upon the opinion of the state agency physician, Dr. Oliver, who did not examine Ms. McDaniel and did not have access to all the relevant medical evidence. Mot. at 14–19. Ms. McDaniel criticizes the ALJ's analysis in this regard for failing to account for all the pertinent evidence, making conflicting statements about the opinions, and relying on inconsistencies in those treaters' notes that relate to minor medical issues, rather than Ms. McDaniel's significant impairments. *Id.* at 18. In response, the Commissioner argues that the ALJ evaluated the opinions of Ms. McDaniel's treating physicians in accordance with the revised

regulations and that substantial evidence supports the ALJ's findings that the opinions of Dr. Green, Dr. Poitier, and Mr. Wiggins were unpersuasive. Resp. 12–16.

In 2017, the Social Security Administration ("SSA") revised its regulations regarding the consideration of medical evidence, with those revisions applicable to all claims filed after March 27, 2017. *See* 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). The revised regulations provide that the SSA will consider medical opinions or prior administrative medical findings using certain factors: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) other factors, such as familiarity with the other evidence in the claim or an understanding of the program's policies and evidentiary requirements. 20 C.F.R. §§ 404.1520c(a), 404.1520c(c). The most important of these factors are supportability[8] and consistency.[9] *Id.* § 404.1520c(a). For example, the more relevant the objective medical evidence and supporting explanation provided by a medical source to support his or her medical opinion, the more persuasive the medical opinion will be. *Id.* § 404.1520c(c)(1). Under the new regulation, an ALJ is to give no "defer[ence] or any specific evidentiary weight, including controlling weight," to a treating physician's opinion. *Id.* § 404.1520c(a). Instead, the ALJ must weigh medical opinions based on their persuasiveness. *Id.*

---

[8] For supportability, the revised rules provide: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[9] For consistency, the revised rules provide: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520(c)(2), 416.920c(c)(2).

### a. Dr. Green's Opinions

The ALJ found Dr. Green's March 2019 opinions, that Ms. McDaniel "could occasionally lift/carry up to 10 pounds; sit for at least 6 hours in an 8-hour workday; stand/walk for at least 4 hours in an 8-hour workday; occasionally had to elevate her legs; and required 4 unscheduled breaks" during the workday, unpersuasive because they are unsupported by his contemporaneous opinions that Ms. McDaniel's pain was of only "mild to moderate" severity, her condition was not expected to last more than twelve months, and she did not require a cane or recliner nor any time during a workday to lay down. (R. 25).

Similarly, the ALJ found Dr. Green's February 2020 opinion, that Ms. McDaniel "could occasionally lift less than 10 pounds; stand for only 1 hour; never climb stairs; bend, stoop, or balance for 10 percent of the time; and required unscheduled breaks and more than 4 days absence a month," was "inherently inconsistent" with Dr. Green's opinion that Ms. McDaniel only had "moderate" pain, did not require an assistive device while engaging in occasional standing, and never had to elevate her legs. *Id.* The ALJ also found that Dr. Green's opinions are "unsupported by his clinical notes, which show consistent noncompliance with his recommendations, including a refusal to have repair surgery; and no worsening that warrants increased limitations in February 2020." *Id.*

As noted above, Dr. Green completed two RFC Questionnaires regarding Ms. McDaniel's physical impairments. (R. 686–87, 838–39). A comparison of the two evaluations, which were completed approximately seventeen months apart, indicates that Dr. Green assessed greater limitations regarding Ms. McDaniel's physical impairments after continued treatment with no significant improvement. *Id.*

In the initial RFC Questionnaire, Dr. Green diagnosed Ms. McDaniel with bilateral pain on both feet whereas in the second RFC Questionnaire he diagnosed chronic plantar

fasciitis on both feet. And, as noted in the ALJ's Decision, Dr. Green initially opined that Ms. McDaniel's pain was only "mild to moderate" and her condition was not expected to last more than twelve months.[10] On the other hand, in the second RFC Questionnaire, Dr. Green found that Ms. McDaniel suffers from "moderate" pain and that her impairments have lasted or can be expected to last more than twelve months.

Ms. McDaniel argues that the ALJ's findings that Dr. Green's opinions are "inherently inconsistent" with his medical records documenting Ms. McDaniel's treatment are not supported by the record. According to Ms. McDaniel, the ALJ emphasizes findings of little importance, like Dr. Green's opinion that Ms. McDaniel did not require a cane or assistive device while occasionally standing or walking, and overlooks relevant findings regarding Ms. McDaniel's physical impairments, including Dr. Green's observations in his treatment notes that Ms. McDaniel's condition was "recalcitrant" and that several treatment options, including injections, immobilization, and medications, have not been effective. (R. 855).

Here, the undersigned finds that Ms. McDaniel is asking the Court to reweigh the evidence. Although the undersigned does not necessarily agree with the ALJ's tipping of the scales, the Court's task is not to question the ALJ's determination of where those scales end up but only to determine if the conclusion is supported by substantial evidence. The undersigned finds there is evidence to support the ALJ's conclusions regarding Dr. Green's opinions. *See Gibbs v. Comm'r, Soc. Sec. Admin.*, 686 F. App'x 799, 800 (11th Cir. 2017) ("Even if the evidence preponderates against the ALJ's findings, we must affirm if the ALJ's decision is supported by substantial evidence.") (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158–59 (11th Cir. 2004)).

---

[10] At the time of the first RFC Questionnaire, Dr. Green had only treated Ms. McDaniel for six months, as noted in the evaluation. (R. 686).

### b.  Mr. Wiggins's Opinions

The ALJ found the opinions of Ms. McDaniel's therapist, Mr. Wiggins, that Ms. McDaniel had poor or no ability in understanding, remembering, and carrying out simple job instructions, interacting with others, maintaining attention/concentration, and functioning independently, and that she required more than fifteen percent time off task and four days absence per month, unpersuasive because, according to the ALJ, Mr. Wiggins examined Ms. McDaniel "a total of no more than 5 occasions early in the period at issue," and his opinion is unsupported by his January 2019 advice to Ms. McDaniel to return to work. (R. 19–20). The ALJ also found that Mr. Wiggins's opinion is "more extreme than warranted and inconsistent with the overall record." (R. 20).

As discussed above, the ALJ appears to have overlooked treatment notes from Ms. McDaniel's numerous visits with Mr. Wiggins without explanation. As also discussed above, the ALJ's cursory review of the relevant medical evidence undermines his determination regarding the persuasiveness of Mr. Wiggins's opinions. The record contains at least thirteen (13) treatment notes from Ms. McDaniel's therapy sessions with Mr. Wiggins, which the ALJ failed to consider. The ALJ's finding that Mr. Wiggins's opinion is "more extreme than warranted and inconsistent with the overall record" is not explained by the ALJ in his Decision and, given the overlooked treatment notes, is not supported by substantial evidence.

### c.  Dr. Poitier's Opinions

The ALJ found the opinion of Dr. Poitier, that Ms. McDaniel had poor or no ability to understand, remember, and carry out complex job instructions, had extreme limitation in interacting with others, concentrating, persisting, and maintaining pace, and adapting or managing oneself, and required more than fifteen percent time off task and more than four days absence per month, unpersuasive because his opinions are "markedly inconsistent with

his benign treatment notes including his finding that [Ms. McDaniel] was friendly and communicative with intact attention/concentration and cognition; and had no hyperactivity, attentional difficulties, delusions, or bizarre behavior." (R. 20). The ALJ also found that Dr. Poitier's opinion is "inconsistent with the totality of the evidence." *Id.*

As with the ALJ's consideration of Dr. Green's opinions, Ms. McDaniel's complaints regarding the ALJ's rejection of Dr. Poitier's opinions go more to the ALJ's weighing of the evidence than to the existence of sufficient evidence to support his conclusions. The undersigned agrees that the ALJ was quick to tip the scales against Dr. Poitier without meaningful explanation, but that is not enough to warrant reversal or remand.

Therefore, the undersigned finds that the ALJ's decision to reject the opinions of Mr. Wiggins is not supported by the record but that his rejection of the opinions of Dr. Green and Dr. Poitier does not, on its own, warrant reversal. Nonetheless, remand is warranted so that the ALJ may reassess the record as a whole after conducting a proper evaluation of Mr. Wiggins's opinions. On remand, and with proper evaluation of the medical records, the ALJ may reach a different conclusion about the treaters' opinions and how they affect the ultimate determination of whether Ms. McDaniel is disabled.

### 3. The ALJ's Consideration Of Ms. McDaniel's Mental Impairments In The RFC Assessment

It is axiomatic that in reaching an RFC determination, an ALJ must consider how a claimant's mental impairments affect the claimant's ability to work, even if the mental impairments are deemed non-severe. *See Schink*, 935 F.3d at 1268–70; *see also* 20 C.F.R. § 404.1545(a)(2) (stating the Commissioner must "consider the limiting effects of all [a claimant's] impairment(s), even those that are not severe, in determining [the claimant's RFC]").

The Eleventh Circuit's opinion in *Schink* is instructive. In *Schink*, an ALJ found that the claimant had several severe physical impairments as well as the non-severe mental impairment of bipolar disorder. 935 F.3d at 1256. Although the ALJ noted that he had "considered all symptoms" in determining the claimant's RFC, the Eleventh Circuit noted that the "content of his decision demonstrate[d that] he did not," as "[n]early the entire section of the ALJ's opinion relating to RFC discusse[d] the claimant's physical impairments" but did not discuss the claimant's mental impairments. *Id.* at 1269. Ultimately, the Eleventh Circuit held that "[e]ven the most favorable interpretation of the ALJ's opinion—namely, that the ALJ considered [the claimant's] mental conditions in the RFC assessment *sub silentio* and implicitly found that they imposed no significant limitations on his work-related mental capacities—would not permit" the court to affirm because "the ALJ's 'failure . . . to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis ha[d] been conducted mandate[d] reversal' in its own right." *Id.* (quoting *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1065, 1066 (11th Cir. 1994)).

Here, the ALJ found that Ms. McDaniel had non-severe mental impairments of major depressive disorder, anxiety, and PTSD at step two. (R. 17). Like in *Schink*, the ALJ noted at step two that "[t]he limitations identified in the 'paragraph B' criteria are not [an RFC] assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process," and "[t]he mental [RFC] assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment." (R. 20); *see Schink*, 935 F.3d at 1269. However, as in *Schink*, the ALJ failed to provide that "detailed assessment" when evaluating Ms. McDaniel's RFC. At step two the ALJ noted, "[t]he following [RFC] assessment reflects the degree of limitation I have found in the 'paragraph B' mental functional analysis." (R. 20). But the RFC assessment itself only includes discussion of Ms.

McDaniel's physical impairments, notwithstanding the ALJ's comment that he "considered all symptoms[.]" (R. 20). In his Decision, the ALJ discusses at length Ms. McDaniel's physical impairments, including her foot pain and spinal disorder. (R. 20–23). Apart from briefly commenting that Ms. McDaniel testified she was unable to work due to PTSD, the ALJ failed to account for Ms. McDaniel's mental impairments in the RFC assessment and whether such impairments may cause additional work-related limitations.

Because the ALJ was required to consider the mild limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting and maintaining pace; and adapting or managing oneself that he found in step two, and he failed to do so, remand is warranted. *See Martin*, 2022 WL 17987332, at *9 (reversing and remanding where the ALJ failed to consider the claimant's mild limitations in the RFC assessment); *Dulude v. Comm'r of Soc. Sec.*, No. 20-cv-00890, 2021 WL 4026268, at *4 (M.D. Fla. Sept. 3, 2021) (concluding that "reversal is mandated" where the court "cannot determine whether the ALJ followed the proper legal analysis regarding [the claimant's] mental impairments" because "the ALJ found [the claimant's] mental impairments [were] non-severe" and "discussed only [the claimant's] many physical impairments but did not discuss whether mild mental limitations in these areas may cause additional work-related limitations").

## VII.   CONCLUSION

For the reasons set forth above, the undersigned finds that the ALJ failed to adequately analyze the specific requirements of Ms. McDaniel's past relevant work under SSR 82-62, rejected the opinions of at least one of her treating physicians without substantial evidence, failed to consider relevant and material medical evidence, and based his RFC determination on inconsistent information and without consideration of Ms. McDaniel's mental impairments, and, therefore, that the ALJ's Decision is not supported by substantial evidence.

47

The undersigned offers no opinion on what a complete and accurate review of the administrative record might conclude on Ms. McDaniel's disability applications, but the undersigned cannot conclude that the ALJ's Decision is supported by substantial evidence, and, therefore, remand is warranted.[11]

## VIII.   RECOMMENDATION

Accordingly, the undersigned respectfully recommends that Plaintiff's Motion for Summary Judgment [ECF No. 17] be **GRANTED**, that Defendant's Motion for Summary Judgment [ECF No. 20] be **DENIED**, and that the ALJ's Decision be **REVERSED** and **REMANDED** with instructions to reanalyze steps four and five of the Social Security Administration's five-step sequential evaluation process, including reevaluating the medical evidence and inconsistencies in the evidence, reconsidering Plaintiff's RFC in light of her mental impairments and her ability to return to past relevant work in compliance with SSR 82-62, and obtaining additional testimony of a vocational expert, if necessary.

The parties will have fourteen (14) days from the date of receipt of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable James Lawrence King, United States District Judge. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in the Report except upon grounds of plain error if necessary in the

---

[11] *See Mills v. Astrue*, 226 F. App'x 926, 931–32 (11th Cir. 2007) (acknowledging evidence in the record not mentioned by the ALJ may support administrative decision but concluding that court could not "say the error was harmless without re-weighing the evidence," which would require "conjecture that invades the province of the ALJ").

interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY SUBMITTED** in Chambers at Miami, Florida, this 10<u>th</u> day of August, 2023.

_____
MELISSA DAMIAN
UNITED STATES MAGISTRATE JUDGE

Copies to:
Hon. James Lawrence King, *U.S. District Judge*
Counsel of Record